J-E02007-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DAVID WIGGINS | |
| Appellant | No. 1668 EDA 2015 |

Appeal from the Judgment of Sentence Entered May 1, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No.: CP-23-CR-0007117-2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., SHOGAN, J.,
LAZARUS, J., STABILE, J., DUBOW, J., NICHOLS, J., and
McLAUGHLIN, J.

DISSENTING MEMORANDUM BY STABILE, J.:          **FILED JULY 19, 2019**

The Learned Majority concludes that the trial court did not abuse its discretion in this case when it denied the defense's motion to strike for cause prospective juror 56 ("PJ 56") whom the defense claimed displayed hesitation and equivocation in his ability to act fairly and impartially.  I respectfully disagree with the Majority's conclusion.  Based on my review of the record, I conclude that the defense's for-cause challenge had merit and that Appellant subsequently suffered sufficient prejudice when he was compelled to use one of his peremptory challenges on PJ 56 and subsequently exhausted all of his peremptories.  I find this conclusion to be well supported by prior precedent of this Court.  Accordingly, I would vacate and remand this matter to the trial court for a new trial.

As the Majority observes, we need not recount the background of this case because the issue on appeal is discrete insofar as it pertains only to the jury selection process. As a result, I will provide only a brief summation of the facts. In connection with an armed robbery of a Rite Aid store in Chester, Pennsylvania, that resulted in the death of Jason McClay (the "victim"), Appellant along with two other individuals ("co-defendants") was charged with a number of offenses, including second-degree murder, robbery and conspiracy. Appellant and co-defendants proceeded to a joint trial.

During jury selection, PJ 56 attracted the defense's attention. Specifically, during the group *voir dire*, PJ 56 did not either stand or respond when the court asked the following two questions. First, "[i]s there anything about the nature of the charges themselves that would prevent you from being a fair and impartial juror in this case?" Second, "[i]s there anyone among you for any reason that I may not have touched upon who could not serve as a fair and impartial juror in this case?" N.T. Trial, 1/28/15, at 35, 38. In addition, PJ 56 responded affirmatively (by standing) to three other questions. First, "[h]ave any of you read, seen, or heard anything about this case in the news media or from some other source?" Second, "[h]ave you or has any member of your family or a close friend ever been the victim of or accused of a crime similar to those with which the [d]efendants are charged?" Third, "[i]s there anyone here who lives or works in the vicinity of 2722 West 9th Street in Chester, Pennsylvania?" *Id.* at 32, 34, 38.

During individual *voir dire*, the trial court followed up on the foregoing areas with PJ 56:

> THE COURT: Sir, you gave a "yes" response to three of my questions, one was having known something or heard about the case, a victim of a similar crime, and either living or working in the vicinity?
>
> JURY PANELIST #56: Yes.
>
> THE COURT: So could you elaborate on all those, why you gave a "yes" response to those?
>
> JURY PANELIST #56: The first one was?
>
> THE COURT: The first one was hearing about the case or reading about the case.
>
> JURY PANELIST #56: Oh, I read the newspaper constantly. I am a subscriber to the *Wilmington Journal* and I read the Sunday *Daily Times* every day -- every Sunday.
>
> THE COURT: So when's the last time you heard about this case or read about it?
>
> JURY PANELIST #56: Last time, when it was active, a couple -- what's it, two years?
>
> THE COURT: Pardon?
>
> JURY PANELIST #56: When it was active, when they were --
>
> THE COURT: Which would have been, what --
>
> JURY PANELIST #56: Two years --
>
> THE COURT: Okay.
>
> JURY PANELIST #56: -- I've heard this.
>
> THE COURT: So the last time you read anything about the case or heard anything about the case?
>
> JURY PANELIST #56: Yes. Um-hum.

THE COURT: Okay. Someone you knew --

JURY PANELIST #56: My wife --

THE COURT: -- victim of a similar crime?

JURY PANELIST #56: Yes, my wife was robbed while she was working in a supermarket, and we work midnights. I work at another store but that -- but a fellow came up with his couple groceries. As soon as the register[] opened, he picked up his shirt, showed her a pistol, said empty the register, and so that was – I thought that was pretty similar.

THE COURT: Okay. All right. And you live or work in the vicinity of --

JURY PANELIST #56: I'm about three miles directly down Market Street.

. . . .

THE COURT: And have you ever been in that particular Rite Aid?

JURY PANELIST #56: In it? No, sir.

THE COURT: Okay. Anyone else have any questions for juror #56?

[Appellant's counsel]: Sir, does the fact that your wife was robbed similar as you say in a grocery store, does that impact your ability to be fair in this particular case? Are you going to be thinking about that?

JURY PANELIST #56: **_Probably not_**. It happened 25 years ago.

[Appellant's counsel]: Okay.

JURY PANELIST #56: **_Probably not_**.

[Appellant's counsel]: But you're not sure; that's why you're saying "probably"?

JURY PANELIST #56: Can I tell you what's in the back of my mind? I was going to say (inaudible) --

[Appellant's counsel]: Okay.

JURY PANELIST #56: -- *leaning towards like 51 percent* not but --

[Appellant's counsel]: Thank you for being honest.

THE COURT: All right.  Any other -- anyone else?

. . . .

MR. WISMER [co-defendant Pultro's counsel]: What do you remember reading about the case?

JURY PANELIST #56: Just the fellow got killed, he was the store manager.  I forget what -- he was helping somebody or something and he -- oh, he was -- he covered for a day off for somebody so he shouldn't even have been there that day and it struck me as no good deeds go unpunished.  I say that all the time.

MR. WISMER: Is that all you remember reading?

JURY PANELIST #56: Pretty -- for the most part.  That's the highlights, yeah. I mean I don't remember exactly how many people were involved, you know, or how -- too much of the details.

MR. WISMER: And it was tragic, certainly, but does that -- is that going to affect your ability to be a fair and impartial juror knowing what you know about what happened to this man?

JURY PANELIST #56: *Probably not*.  Again, *I'm going to say probably 51 percent on it*.

THE COURT: Let me phrase the question a little differently.

JURY PANELIST #56: Please.

THE COURT: Is there a doubt in your mind about your ability to be fair and impartial?

JURY PANELIST #56: *No.  I can do it.  I can do it*.

THE COURT: All right.  Anyone else?

MR. TINARI [co-defendant Mahmud's counsel]: May I just follow that up briefly?

THE COURT: Yes.

MR. TINARI: It seems as though you're hesitating. There's no right or wrong answer even to the Judge's question. We're just trying to find out --

JURY PANELIST #56: I –

MR. TINARI: -- what's in your heart and your mind, and when -- as lawyers especially for Defendants who are accused of crimes, we hear probably or 51 percent, that makes us nervous. So we're just asking you --

JURY PANELIST #56: Absolutely.

MR. TINARI: -- just as the Court did, it seems as though there's a little bit of hesitation, and if there is, just tell us. It's okay. No one's going to --

JURY PANELIST #56: And I realize --

MR. TINARI: -- thinking negatively of you --

JURY PANELIST #56: -- *you've got 120 -- 18 other people* --

MR. TINARI: -- you know what I mean? We're --

JURY PANELIST #56: -- *that you can use*.

MR. TINARI: -- just trying to proceed in accordance with what we're required to ask.

JURY PANELIST #56: Yes.

MR. TINARI: And if your answer is you have some doubt, just tell us.

JURY PANELIST #56: *I'd have to be saying I was kidding you if there was absolutely nothing because I experienced it*.

MR. TINARI: Understood.

JURY PANELIST #56: *But I still think I could probably be fair*. I mean I understand --

MR. TINARI: You still think you can be? See, that's what's making us --

JURY PANELIST #56: I'm --

MR. TINARI: You know what I'm saying?  If you were in our shoes

JURY PANELIST #56: I can --

MR. TINARI: -- you wouldn't want to hear someone say --

JURY PANELIST #56: I see.

MR. TINARI: -- well, I think I could be fair, I'm hoping I could be fair.

JURY PANELIST #56: I can appreciate your -- you on that. *I think I can* -- okay. So --

MR. TINARI: All right.  I won't ask any more times.

JURY PANELIST #56: I --

MR. TINARI: That's -- I think --

JURY PANELIST #56: *I believe I can*.

MR. TINARI: Okay.  Thank you, sir.

JURY PANELIST #56: *I believe I can* and I --

THE COURT: Mr. DiRosato?

MR. DIROSATO [for the Commonwealth]: Sir, the role of a juror is to hear the evidence --

JURY PANELIST #56: Exactly.

MR. DIROSATO: -- to weigh the evidence per the instructions given by the Court.

JURY PANELIST #56: Exactly.

MR. DIROSATO: And --

JURY PANELIST #56: I'm not trying to be rude.

MR. DIROSATO: -- the Court will give you the instructions on the law, take whatever facts as you find true along with your fellow jurors and apply that to the law to determine whether the Commonwealth has met its burden beyond a reasonable doubt to

prove these Defendants guilty of the crimes they're facing – have been charged with.

JURY PANELIST #56: Exactly.

MR. DIROSATO: And knowing that, can you put aside your past experience and follow the Court's instruction and render a verdict based upon a fair and impartial weighing of the evidence?

JURY PANELIST #56: *I think I can*. I'm saying -- I said -- okay. I can. Putting it in context, you show me evidence, it is or it isn't.

MR. DIROSATO: If the Commonwealth fails to meet your – meet its burden, would you hesitate and acquit these Defendants?

JURY PANELIST #56: If you didn't prove they did it, I will.

THE COURT: You understand that it has to be proven beyond a reasonable doubt. It's not a 51 percent. It's *beyond a reasonable doubt*. Do you understand that?

JURY PANELIST #56: Yes, sir.

THE COURT: And you could *follow that standard*, correct?

JURY PANELIST #56: Yes, sir. *I'm sure I could*.

N.T. Trial, 1/28/15 (Vol. II), at 280-88 (emphasis added). As the Majority notes, counsel for one of the co-defendants then moved to strike for cause PJ 56 based on PJ 56's equivocation and hesitation in his responses to the questions relating to fairness and impartiality. *Id.* at 288. Appellant's counsel joined the motion, asserting that PJ 56 gave two different responses. *Id.* at 289 ("There's two [answers]. Either you can be or you can't be. I mean it shouldn't matter the wording of the question. The meaning is still the same, and based on that, I think the [trial court] should grant the challenge."). The trial court denied the defense's for-cause motion to strike PJ 56. Subsequently, as my review of the strike list reveals, Appellant's counsel

exercised a peremptory challenge, Appellant's second out of three such challenges,[1] to strike PJ 56. As a result, PJ 56 was neither selected nor seated as a juror in this case.

On appeal, Appellant principally argues that the trial court abused its discretion in denying the defense's motion to strike for cause PJ 56 and, as a result, Appellant was prejudiced by exercising one of his three peremptory challenges to strike PJ 56. Unlike the Majority, I agree.

It is well-settled that we apply an abuse of discretion standard in reviewing a trial court's decision to grant or deny a for-cause challenge. ***Commonwealth v. Cox***, 983 A.2d 666, 682 (Pa. 2009). In ***Commonwealth v. Briggs***, 12 A.3d 291 (Pa. 2011), our High Court explained:

> A trial court's decision regarding whether to disqualify a juror for cause is within its sound discretion and will not be reversed in the absence of a palpable abuse of discretion. In determining if a motion to strike a prospective juror for cause was properly denied our Court is guided by the following precepts:
>
>> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or

---

[1] I observe that each of the three defendants here received three peremptory challenges for an aggregate of nine peremptories. The defendants in their sole discretion were free to use, or not use, their respective challenges. The Commonwealth also received nine such strikes.

situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

*Id.* at 332-33 (citations omitted).

"[T]he jury selection process is crucial to the preservation of the right to an impartial jury as guaranteed by Article I, § 9 of the Pennsylvania Constitution." *Commonwealth v. Buford*, 101 A.3d 1182, 1191 (Pa. Super. 2014) (citation omitted), *appeal denied*, 114 A.3d 415 (Pa. 2015). Indeed, "[t]he purpose of *voir dire* is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court." *Commonwealth v. Noel*, 104 A.3d 1156, 1168 (Pa. 2014) (citations omitted). We long have explained:

> There are two types of situations in which challenges for cause should be granted: (1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at *voir dire.* In the former situation, the determination is practically one of law and as such is subject to ordinary review. In the latter situation, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in case of palpable error.

*Commonwealth v. Kelly*, 134 A.3d 59, 61-62 (Pa. Super. 2016) (citations omitted), *appeal denied*, 158 A.3d 75 (Pa. 2016). Moreover, the law

> recognizes that it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings. We can only attempt to have them put aside those prejudices in the performance of their duty, the determination of guilt or innocence. We therefore do not expect a tabula rasa but merely a mind

sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influence of irrelevant facts.

*Commonwealth v. Pittman*, 466 A.2d 1370, 1373 (Pa. Super. 1983) (citations omitted). Finally, a new trial will be granted when "a defendant is forced to use one of his peremptory challenges to excuse a prospective juror who should have been excused for cause, and then exhausts his peremptories before the jury is seated." *Commonwealth v. Johnson*, 445 A.2d 509, 514 (Pa. Super. 1982); *accord Commonwealth v. Penn*, 132 A.3d 498, 505 (Pa. Super. 2016).

In *Johnson*, during *voir dire*, a prospective juror indicated by his answers that he would not be impartial and the questioning revealed that the reason for his attitude was a situational relationship. *Johnson*, 445 A.2d at 512. In particular, he stated that his daughter was the victim of a robbery and rape with facts similar to the case in that matter. The prospective juror became distressed to the point where he practically broke down. *Id.* He repeatedly acknowledged that he was surprised at how he was reacting and how strongly he felt. *Id.* As a result, the prospective juror wavered on whether he could be fair and impartial in Johnson's case. When questioned about whether he could be fair, the prospective juror remarked, *inter alia*, "I think it would be difficult[,]" and "I'm wondering if I am able to do it." *Id.* at 512-13 (record citations omitted). Given his strong emotional reactions, the prospective juror indicated that he might not have "full control" when following the court's instructions in the case. *Id.* at 513. The trial court ultimately

denied the appellant's for-cause challenge to strike prospective juror. The appellant exercised a peremptory challenge to strike the prospective juror and subsequently exhausted his peremptory strikes.

On appeal, and based on the foregoing record, a panel of this Court concluded that the trial court erred in denying the appellant's for-cause challenge. In so doing, we reasoned the prospective juror

> vividly demonstrated during *voir dire* that he would be likely not to be an impartial juror. He not only visibly manifested emotional distress but specifically expressed substantial doubts about his ability to be impartial at **least five times**. Although he acknowledged that "logically" he could separate the robbery and rape of his daughter from the robbery of appellant's victims, he added at once that "emotionally, I can see that I don't have full control."

***Id.*** at 514 (emphasis added). We also concluded that the prospective juror's "eventual assurance to the court that he would '[b]e fair' did not dispel the force of these admissions." ***Id.*** (citation omitted). We explained:

> This is particularly so in view of the court's questions, which [the prospective juror] may well have understood as suggesting that his proper response, and the response desired by the court, was to say, despite his doubts, that he would be an impartial juror. It is not the court's function to persuade a prospective juror to put aside doubts expressed, and explained, as earnestly as [this prospective juror's] were.

***Id.*** We, therefore, held in ***Johnson*** that the trial court abused its discretion in denying the appellant's motion to strike for cause the prospective juror and that the error was not harmless because the appellant was "forced to use one of his peremptory challenges to excuse" the prospective juror, and he "exhaust[ed] his peremptories before the jury was seated." ***Id.*** Accordingly,

- 12 -

we vacated the appellant's judgment of sentence and granted him a new trial. *Id.*

Relying upon ***Johnson***, we arrived at the same outcome in ***Penn***. There, a prospective juror, R.Z., conveyed to the court during *voir dire* that she previously had worked in law enforcement, and that her boyfriend was a police officer. ***Penn***, 132 A.3d at 500.

> [[Penn's] Attorney]: So you're pretty steeped in law enforcement?
>
> A: Yes.
>
> [[Penn's] Attorney]: You would be more likely to believe the testimony of a police officer?
>
> A: Yes.
>
>  . . . .
>
> [[Penn's] Attorney]: So you're going to have to hear from two or three police officers in this case. And you—because of your own personal experience in working in law enforcement, you would give them credibility, extra credibility simply because they are police. And there are no right or wrong answers. Would it be hard for you not to believe them?
>
> A: I feel like I would be more inclined to believe them, yes.
>
> [[Penn's] Attorney]: I have nothing else....
>
> [The Commonwealth]: What it comes down to though, the Judge would tell you that you can't give them any more weight or credibility. You would be instructed to do that. Do you think you could follow the instruction and not raise them up because of their position?
>
> A: Yes.
>
>  . . . .

[The Commonwealth]: Obviously your relationship with your boyfriend, would that—and the testimony of there being police officers in this case, would you be able to be fair and impartial?

A: ***I would think so, yes***.

[The Commonwealth]: Follow up?

[[Penn's] Attorney]: Well, when you—well, when you say you think so, I mean, basically the entire Commonwealth case is going to be testimony from the police officers. Would it be difficult for you to just not believe them because of your experience? I mean, you've been a police officer, you've worked with police, you're dating a police officer. I presume you have a certain attachment to this profession.

A: Correct.

[[Penn's] Attorney]: I'm not going to offend you in any way if I am—I apologize, but would it be difficult to not—kinship to the police to cause for you not to be able—

A: I think it all comes down to evidence, testimony. So as long as I'd—

[[Penn's] Attorney]: If they got up there and said, we don't know anything and we didn't see anything, I would understand, but if they testify to facts which you believe would be enough to convict, would it be hard for you not to believe them because of your experience? Would you, as you said before, you would be inclined to believe them?

A: (Nods head [in the affirmative].)

[[Penn's] Attorney]: I know it's based on the evidence.

A: Right.

[[Penn's] Attorney]: But there would be an inclination on your part, because of your experience, to be more likely to credit their testimony?

A: I mean—again, I think it comes down to the evidence though.

***Id.*** at 500–01(some brackets added) (emphasis added).

In determining that the trial court should have stricken for cause R.Z., we stressed that, like the juror in ***Johnson***, R.Z. "initially indicated that she was incapable of 'rendering a fair, impartial and unbiased verdict.'" ***Penn***, 132 A.3d at 504. We also relied on the fact that R.Z. "unequivocally testified during *voir dire* that she 'would be more likely to believe the testimony of a police officer,' thus indicating that [she] was biased in favor of the police and the Commonwealth." ***Id.*** As an additional similarity to ***Johnson***, "R.Z.'s admitted bias in favor of the police rested on a firm bedrock," given R.Z.'s prior employment in law enforcement, and that her boyfriend was a police officer. ***Id.*** at 505. Finally, the ***Penn*** Court concluded that,

> as in ***Johnson***, R.Z. eventually testified that she would be able to follow the trial court's instructions and render a "fair and impartial" decision. However, in the case at bar, almost immediately after R.Z. testified that she would be able to "be fair and impartial," R.Z. **again** testified that, "because of [her] experience[,] . . . [she] would be inclined to believe" the police. Therefore, as we held in ***Johnson***, we hold in the case at bar that "[R.Z.'s] eventual assurance to the [trial] court that [she] would 'be fair' did not dispel the force of [her] admissions" of bias.[FN1] ***Johnson***, 445 A.2d at 514.
>
>> [FN1.] R.Z.'s declaration that "it comes down to the evidence" also did not dispel her admissions of bias, given that R.Z.'s admitted view of the evidence was that police officers were entitled to more credibility.

***Id.*** (emphasis in original). Thus, given that Penn had used a peremptory strike to excuse R.Z., and then exhausted his remaining peremptory challenges, the ***Penn*** panel granted him a new trial. ***Id.***

In light of and consistent with **Johnson** and **Penn**, two cases that are virtually indistinguishable from this case, I conclude that Appellant is entitled to a new trial because the trial court abused its discretion in denying the defense's for-cause challenge to strike PJ 56. My record review confirms Appellant's contention that PJ 56 displayed sustained hesitation and equivocation in answering whether he would be fair and impartial. As detailed earlier, in responding to specific questions about fairness and impartiality by a counsel for one of Appellant's co-defendants, **PJ 56 remarked thrice "probably not," and twice "leaning towards like 51 percent" or "probably 51 percent."** Thereafter, the trial court asked PJ 56 whether there was "a doubt in [his] mind about [his] ability to be fair and impartial[.]" PJ 56 responded, "No. I can do it. I can do it." Immediately, thereafter, counsel for another co-defendant inquired further about PJ 56's ability to act fairly and impartially. In response, PJ 56 again expressed hesitation and equivocation and seemingly questioned why the parties did not select another prospective juror. Indeed, PJ 56 stated, "I'd have to be saying I was kidding you if there was absolutely nothing because I experienced it" and "But I still think I could probably be fair." PJ 56 repeatedly vacillated and qualified his responses using the phrases "I believe" or "I think." Toward the end of PJ 56's individual *voir dire*, the trial court once again participated in questioning PJ 56. In so doing, however, the trial court altered the line of questioning. Instead of inquiring about PJ 56's ability to be fair and impartial, the trial court shifted the focus away from PJ 56's ability to act fairly and asked PJ 56 about

his ability to apply the correct standard of proof, *i.e.*, the beyond a reasonable doubt standard. This question, of course, was irrelevant to the issue of fairness and impartiality. Given the foregoing and under the circumstances of this case, I am constrained to conclude that the trial court abused its discretion in denying the defense's motion to strike for cause PJ 56 who could not separate the incident involving his wife from the instant case and expressed sustained equivocation and hesitation.

Moreover, like the appellants in **Johnson** and **Penn**, Appellant was also forced to use a peremptory challenge to strike a prospective juror whom the trial court refused to excuse for cause.[2] Upon reviewing the certified record, in particular the strike list *sub judice*, it is apparent that Appellant exercised his second of three peremptory challenges to strike PJ 56. Thereafter, Appellant exhausted his peremptories. Thus, as we held in **Johnson** and reaffirmed in **Penn**, I must conclude that the error of not striking for cause PJ 56 was not harmless "[w]here, as here, a defendant is forced to use one of his peremptory challenge to excuse a prospective juror who should have been excused for cause, and then exhausts his peremptories before the jury is seated, a new trial will be granted." **Penn**, 132 A.3d at 505 (quotation and

---

[2] Based upon the outcome herein, which is premised on a conclusion that Appellant in fact exercised to his detriment one of his three peremptory challenges to strike PJ 56, I decline to address Appellant's argument that he shared a common interest with his co-defendants in the selection of the jury. In particular, I decline to entertain the argument that in a joint trial, irrespective of which defendant uses a peremptory to strike a prospective juror following the denial of a for-cause challenge, all defendants are presumed to have suffered prejudice.

citation omitted). I, therefore, respectfully dissent and would vacate and remand this case to the trial court for a new trial.